UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

          Plaintiff,

   v.                                           Case No. 25-CR-103

RYAN SCHROEDER,

          Defendant.

## DECISION AND ORDER

**1. Background**

Ryan Schroeder, a former physical education teacher at Mishicot High School, is charged with two counts of production of child pornography. The charges stem from a two-year sexual relationship he had with a student, beginning when the student was 14 years old.

The relationship came to light after law enforcement learned that Schroeder exchanged sexually explicit photos with a different middle-school student. Manitowoc County Sheriff's Office Detective Nate Steber met with Schroeder in a conference room at Mishicot High School after the district's superintendent removed Schroeder from class. (ECF No. 11-1 at 1.) Detective Steber conducted that interview without first advising Schroeder of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). Schroeder argues that statements he gave during that interview, as well as all

derivative evidence, must be suppressed as a result. He also seeks to suppress evidence found on his cell phone on the basis that Steber searched it without a warrant. Following an evidentiary hearing and post-hearing briefs from the parties, Schroeder's motion is ready for resolution. A summary of the evidence adduced at that hearing is set forth below.

**2. Facts**

On April 16, 2025, Mishicot Police Detective James Brooks went to Mishicot High School (a complex that combines the middle and high schools) after being informed by his chief that there was an incident that school officials needed help with. Brooks initially met with school officials and learned that, based on what they had uncovered in their investigation, Schroeder was going to be placed on administrative leave at the end of the school day. Brooks then met with a seventh-grade student and learned that she had exchanged sexually explicit photos with Schroeder. (Ex. 12A.)

Brooks requested assistance with the investigation, and Manitowoc County Sheriff's Office Detective Nate Steber was sent to the school. On his way over, Steber received instructions from his boss and the district attorney's office that under no circumstances were they to arrest Schroeder based only on the information that the seventh-grade student had provided.

After receiving a brief summary of the situation and sitting in on a portion of Brooks's meeting with the seventh-grade student, Brooks and Steber asked the superintendent to get Schroeder so they could talk to him.

The district's superintendent had Schroeder leave his class. The superintendent walked with him to a conference room in the school, but did not discuss what was going on. The conference room was relatively large, about 16 feet by 20 feet, with doors at either end. There was a conference table in the room large enough for eight chairs to go around it. Schroeder waited alone in the conference room until Brooks and Steber entered. Steber audio recorded this meeting and the portions for which Brooks was present were audio and video recorded by his body-worn camera. All these recordings were received by the court.

Steber took the lead from that point. After introducing himself and shaking Schroeder's hand, he asked if Schroeder knew why law enforcement would be talking with him. When Schroeder denied any knowledge, Steber challenged him, said he thought he did know why, and encouraged him to cooperate.

Steber then said, "I need your phone." When Schroeder asked why, Steber responded, "Because I'm going to take it." After Schroeder turned over his phone, Steber explained that he was conducting an investigation involving electronics and specifically what Schroeder was doing with them. Steber then demanded Schroeder's "iWatch," which Schroeder turned over.

Steber began to manipulate the phone, and asked Schroeder for his passcode. There was a long pause before Schroeder responded, "Can we just talk quick?"

Steber stated that he believed that Schroeder knew why they were talking and that this was as informal as things would be. He said that the details were either

public or would be soon and if Schroeder cooperated, Steber would be as considerate of Schroeder's family as he could be.

Schroeder proceeded to explain that he had "inappropriate communications" with a student. He provided additional details in response to Steber's questions. After Schroeder confirmed that he had sent sexually explicit photos to the seventh-grader and had sexually explicit chats with her, Steber turned back to Schroeder's cell phone. He explained that they needed to do an examination of his phone and therefore needed the passcode. Steber asked if they would find any other sexually explicit images of children on his phone, which led Schroeder to ask, "What am I looking at here?"

Steber explained that it was a criminal offense, but then he asked what Schroeder meant. Schroeder responded, "What's next?"

Steber said that once they were done with this interview, they would be doing a search warrant at his home and would take all the electronic devices in the house. What happened from there, Steber explained, would depend on what they found and Schroeder's cooperation.

Schroeder asked if was going to go to jail that night, and Steber responded that he did not know yet; it depended on a lot of things including what Steber's supervisors decided and Schoeder's cooperation. Steber explained how investigators have the option of referring a case to prosecutors before making an arrest.

Steber then returned to the question of what they were going to find when they searched Schroeder's phone. After a long pause, Schroeder asked if Brooks, who had

been standing silently in the conference room, could step out. Brooks agreed, and Steber asked that Brooks call Steber's supervisor.

Once Brooks left, Schroeder explained that there was a second student, a 16-year-old, with whom he has had a two-year relationship. Shortly into that discussion, Brooks stepped back in and asked Steber, "CSAM?" (pronounced see-sam), which is legal and law enforcement jargon for "child sexual abuse material," or what under federal law is termed child pornography, *see* 18 U.S.C. § 2256(8). Steber responded affirmatively, and when Brooks asked if Steber had viewed it, he said, "Not yet." Brooks then left again.

The conversation about Schroeder's relationship with the 16-year-old continued, with Schroeder readily and candidly providing all the details Steber requested and repeatedly expressing concern for the student's wellbeing. The conversation was calm and cordial. After Schroeder provided details of the lengthy sexual relationship, Steber said he needed to step out and call his boss and that Brooks would remain in the room with Schroeder. Before leaving, he told Schroeder, "I need to go through your phone." Schroeder immediately provided the passcode in response.

When Steber stepped out he contacted his supervisor, and they made the decision that Schroeder would be transported to the sheriff's office and that Schroeder would be arrested. They made that decision based on Schroeder's admission that there was a second student involved and that his relationship with that student had been physical and not confined to an exchange of messages or photos.

Uniformed deputies arrived at the school, handcuffed Schroeder, and transported him to the sheriff's office. Steber told Schroeder that he was being handcuffed only as a matter of policy because he was being transported by the sheriff's department.

At the sheriff's department Schroeder was placed in a soft interview room—a room with upholstered chairs and a sofa. A deputy waited in the hallway, just outside the open door to the room, until Steber arrived. Before continuing to question Schroeder, Steber advised him of his *Miranda* rights and had him sign a written waiver of those rights. (Ex. 9.) Schroeder also consented in writing to a search of his phone, providing his general PIN and a PIN for a separate secure folder. (Ex. 10.)

3. Statements

   3.1. Applicable Law

"The Fifth Amendment protects individuals from self-incrimination." *United States v. Leal*, 1 F.4th 545, 549 (7th Cir. 2021). The Supreme Court in *Miranda v. Arizona*, 384 U.S. 436 (1966), gave effect to this right by requiring law enforcement to advise individuals of their rights to remain silent and to have counsel present before being subject to custodial interrogation. *Leal*, 1 F.4th at 549.

Two elements must be satisfied before a person is entitled to what have come to be commonly referred to as the *Miranda* warnings: the person must both be in custody and interrogated. *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). Interrogation "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody)

6

that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301.

A person is in custody for *Miranda* purposes if he is "'formally arrested' or 'subjected to restraints of freedom such that the conditions of a formal arrest were closely approximated or actually attained.'" *Leal*, 1 F.4th at 549 (quoting *United States v. Patterson*, 826 F.3d 450, 455 (7th Cir. 2016)). Custody is assessed objectively and based on all the circumstances. *Howes v. Fields*, 565 U.S. 499, 509 (2012); *J. D. B. v. North Carolina*, 564 U.S. 261, 271 (2011). Thus, what the suspect or the interrogating officers subjectively believed is irrelevant. *J. D. B.*, 564 U.S. at 271.

"Relevant factors include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." *Howes*, 565 U.S. at 509 (internal citations omitted). If a reasonable person in the defendant's position would have felt that he could have ended the interrogation and left, the defendant was not in custody. *Id.* (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). "In the end, there is no custody unless 'the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*.'" *United States v. Cox*, 54 F.4th 502, 511 (7th Cir. 2022) (quoting *Lentz v. Kennedy*, 967 F.3d 675, 689 (7th Cir. 2020)).

*Miranda* is aimed at protecting against coercion, and not every restraint on movement is so coercive that the *Miranda* warnings are required. *Howes*, 565 U.S. at 509. There are circumstances where a person is not free to leave, yet not in custody

7
Case 1:25-cr-00103-BBC    Filed 12/11/25    Page 7 of 18    Document 24

for *Miranda* purposes. *Id.* For example, a driver detained on the side of the road for a traffic violation is not free to leave but neither is he in custody and entitled to the warnings under *Miranda. Id.* at 510. Similarly, "the temporary and relatively nonthreatening detention involved in a … *Terry* stop does not constitute *Miranda* custody." *Maryland v. Shatzer*, 559 U.S. 98, 113 (2010) (internal citation omitted) (citing, in part, *Terry v. Ohio*, 392 U.S. 1, 8 (1968)).

The government does not dispute that Schroeder was subject to interrogation. Moreover, once law enforcement transported him to the sheriff's office, Steber advised Schroeder of his rights under *Miranda*, which he agreed to waive. (See Ex. 9 (written *Miranda* waiver).) But if there was a prior *Miranda* violation, this waiver may be invalid. *Cf. Missouri v. Seibert*, 542 U.S. 600, 617 (2004) (holding that a *Miranda* waiver may be invalid if preceded by un-warned custodial interrogation). Thus, the court's analysis turns to the issue of custody as it relates to Schroeder's interactions with the detectives in the high school conference room.

### 3.2. Analysis

After Schroeder's supervisor, the school district superintendent, pulled him out of his classroom, Schroeder was directed to a school conference room where he was soon confronted by two law enforcement officers. Steber immediately demonstrated his control over the interaction by demanding Schroeder's cell phone. When Schroeder questioned this demand, all Steber provided was the non-response, "Because I'm going to take it." The statements from the seventh-grade student—an apparently truthful citizen witness—provided both probable cause to seize

Schroeder's phone and to arrest him. *See Driebel v. City of Milwaukee*, 298 F.3d 622, 643 (7th Cir. 2002) ("we have consistently held that an identification or a report from a single, credible victim or eye-witness can provide the basis for probable cause" (quoting *Woods v. City of Chi.*, 234 F.3d 979, 996 (7th Cir. 2000))).

Schroeder admitted to having exchanged sexually explicit images with a seventh-grader, which Steber acknowledged was a criminal matter. Although Brooks left the room for a time at Schroeder's request, the investigators never left Schroeder alone. When Steber had to step out, Brooks stepped back in. At the end of the meeting, Schroeder was handcuffed and transported to the sheriff's office, where the interrogation continued. He was eventually booked into jail, and he has remained in custody ever since. At no point did either investigator advise Shroeder that he was free to leave or not answer questions. All of these facts weigh in favor of finding that Schroeder was in custody when he was interrogated at the school.

Other facts, however, weigh in favor of finding that a reasonable person in Schroeder's position would not believe he had been arrested or had his liberty restrained in a manner akin to arrest. Although it was clear that Schroeder was the focus of a criminal investigation, that does not render him in custody. *United States v. Weiss*, 153 F.4th 574, 580-81 (7th Cir. 2025). The superintendent did not require Schroeder to speak with investigators; he did not even tell Schroeder that he would be meeting with law enforcement. Thus, the fact that his supervisor had directed him to the conference room where he met with investigators does not support a finding that Schroeder was in custody. *See United States v. Muegge*, 225 F.3d 1267, 1270-71,

13 Fla. L. Weekly Fed. C 1094 (11th Cir. 2000) (finding that the district court erred by placing too much weight on the fact that the defendant's supervisor ordered him to meet with investigators) (citing *United States v. Mahan*, 190 F.3d 416, 421 (6th Cir.1999) (defendant not in custody despite being summoned to interview by work supervisor); *United States v. Leese*, 176 F.3d 740 (3d Cir.1999) (postal employee interview not custodial despite postmaster's order to speak with postal inspectors in the postmaster's office); *United States v. Baird*, 271 U.S. App. D.C. 121, 851 F.2d 376, 380 (D.C.Cir.1988) (Coast Guard officer's interview not custodial despite order by his superior officer to appear for an interview with a Treasury Department investigator).

That the interview occurred at Schroeder's workplace—a place where he would be expected to feel comfortable—rather than a police-dominated environment like a police station, supports a finding that he was not in custody. *See United States v. Borostowski*, 775 F.3d 851, 862 (7th Cir. 2014) (noting that questioning in "familiar surroundings" "generally weighs in favor of finding that he was not in custody"); *see also United States v. Laurita*, 821 F.3d 1020, 1027 (8th Cir. 2016) (citing *United States v. Wallace*, 323 F.3d 1109, 1113 (8th Cir. 2003) (stating an interview that took place at the suspect's workplace was not police dominated)); *see also United States v. Gunville*, No. 3:17-CR-30062-RAL, 2017 U.S. Dist. LEXIS 168077, at *13 (D.S.D. Sep. 8, 2017) (surveying Eighth Circuit law regarding custody vis-à-vis workplace interrogation); *United States v. Paskel*, No. 06-CR-207, 2006 U.S. Dist. LEXIS 113314, at *14 (E.D. Wis. Dec. 22, 2006) (defendant not in custody during an interview in a small security office at her workplace).

The conference room was large and comfortable. *Cf. United States v. Baxter*, 982 F. Supp. 2d 886, 903 (E.D. Wis. 2013) (noting that if an interview occurs in an office or conference room, it tends to weigh against a finding that a person was not in custody). The two separate doors to the room, located on opposite ends of the room, were closed, but this appears to have been for privacy rather than security. Notably, at one point Schroeder even asked for a door to be closed before they continued their discussion. One door was behind Steber and Brooks stood next to it while he was in the room. The other was behind Schroeder, and thus Schroeder could have accessed that door without having to pass Steber or Brooks.

Both detectives "wore street clothes and kept their weapons at bay." *Cox*, 54 F.4th at 512. There were only two law enforcement officers, *id.*, and when Schroeder asked for Brooks to leave, he did so. "No force, handcuffs, or threats were used" during the interrogation. *Id*. Although Steber never told Schroeder that he was free to go, he indicated that it was up to Schroeder whether to cooperate. At no point did Schroeder ask if he could leave, suggest that he wanted to leave, or otherwise seek to end the interview. *Leal*, 1 F.4th at 551.

The substantive portion of the interview was short—roughly 30 minutes. *See Cox*, 54 F.4th at 512 (defendant not in custody during two-hour interrogation). When Steber returned after checking in with his boss, discussions were generally limited to how they were going to transport Schroeder to the sheriff's office.

Perhaps most significantly, when Schroeder asked if he was going to jail that night, Steber told him that he did not know yet. Granted, Steber had probable cause

to arrest Schroeder before he entered the conference room. But as Steber explained to Schroeder, just because he could arrest him did not mean he would.

Steber's uncertainty would have conveyed to a reasonable person in Schroeder's position that, at that moment, he was not yet under arrest given the common presumption that persons under arrest go to jail. *See Baxter*, 982 F. Supp. 2d at 903 ("A reasonable person who has just been told she is not under arrest is very unlikely to believe she had been arrested."). Granted, Steber expressed his uncertainty over whether Schroeder would be arrested before Schroeder had confessed his physical relationship with the sixteen-year-old student. A reasonable person may believe that this additional admission could affect investigators' decision to summarily arrest him (as Steber testified it did). But even then, there is a material distinction between a person's belief he *will be* arrested and a belief that he *has been* arrested. And a non-custodial interrogation does not become custodial simply because the suspect offers inculpatory statements. *See Cox*, 54 F.4th at 513 ("*Miranda* is not required whenever agents hold a productive interrogation.") (citing *Leal*, 1 F.4th at 550).

That Schroeder eventually was handcuffed, transported to the sheriff's department, and booked into jail where he has remained, did not somehow retroactively render him under arrest (any more than police can cure a *Miranda* violation by releasing a suspect at the end of an interrogation).

Considering all the relevant circumstances, the greater weight of the evidence supports a finding that a reasonable person in Schroeder's position would not have

believed, at any point during the interrogation at the school, that his freedom had been restrained in a manner akin to a formal arrest.

Again, *Miranda* custody relates to a very narrow and specific type of restraint—arrest—which may be seen as imposing a high standard. *See Cox*, 54 F.4th at 511. For example, in *Patterson*, 826 F.3d 450 (7th Cir. 2016), the court held that a defendant was not in custody despite having been confronted by FBI agents at his home, patted down, transported to a local FBI office, and subject to a two-hour interrogation (although the agents asked the defendant to confirm that he was going voluntarily).

*Miranda* custody does not arise from the myriad sorts of pressures—social, economic, professional, or personal—that lead a person to colloquially say they are not free to leave many routine situations. For example, an employee might not feel free to walk out on his job during the middle of the workday, yet no one would say that workers have been arrested. A reasonable person in Schroeder's position may have felt similar pressures to remain and speak with Steber. Schroeder even explicitly referred to some—his own contrition, concerns for his children, and concern for the welfare of the sixteen-year-old student. But *Miranda* is concerned with only whether Schroeder remained in that conference room and continued to speak with Steber because of an objective belief that he had been arrested. Because a reasonable person in Schroeder's position would have believed he was ultimately free to end the interrogation and leave, he was not in custody. *See Leal*, 1 F.4th at 549. Because he

was not in custody, Steber was not required to advise him of his rights under *Miranda* before interrogating him. *Id.*

Insofar as Schroeder is arguing that his statement at the school or his subsequent statement at the sheriff's station were involuntary, the argument fails. Steber's questioning was comparatively benign. He used certain interrogation techniques like rapport building and professing to know more than he did, but the evidence does not support the conclusion that Schroeder's statements were the "result of physical abuse, psychological intimidation, or deceptive interrogation tactics calculated to overcome [his] free will," *United States v. Ji Chaoqun*, 107 F.4th 715, 733 (7th Cir. 2024) (quoting *United States v. Lawal*, 231 F.3d 1045, 1048 (7th Cir. 2000)). The court will deny Schroeder's motion to suppress his statements.

### 4. Search of Phone

Schroeder also moved to suppress evidence obtained from his phone on the basis that Steber searched it without a warrant or consent. Schroeder argues:

> Instead of initially seeking his consent, Detective Steber decided to search through Mr. Schroeder's phone. (Doc. 18 at 66-69). Detective Steber then directed his interrogation using the information he had illegally obtained and further avoided advising Mr. Schroeder of his rights, and only then did law enforcement obtain his written consent to search the contents of the phone. (*Id.* at 70-71, 76-82).

(ECF No. 22 at 20.)

Schroeder's assertions are wholly unsupported by the evidence and expressly contradicted by the portions of the record he cites. The government responds that "the record at the hearing proved that no search occurred at the school. Instead, based on the testimony of Brooks and Steber, corroborated by Brooks's bodycam videos, Steber

14

Case 1:25-cr-00103-BBC    Filed 12/11/25    Page 14 of 18    Document 24

simply placed the phone in 'airplane mode' at the school and waited to search it until he obtained Schroeder's consent at the Sheriff's Office." (ECF No. 21 at 20.)

The government is correct that Steber merely unlocked the phone and placed it in airplane mode before he later obtained Schroeder's written consent to search the phone. However, even these actions—a police officer unlocking a phone and placing it into airplane mode, *i.e.*, turning off its network connectivity—likely constituted a search under the Fourth Amendment. *See United States v. Bell*, No. 15-10029, 2016 U.S. Dist. LEXIS 52651, at *6 (C.D. Ill. Apr. 20, 2016) (holding that officer opening flip phone and turning it off constituted a search); *cf. Arizona v. Hicks*, 480 U.S. 321, 324-25 (1987) (holding that moving a stereo component to view a serial number constituted a search).

Thus, perhaps the government's contention that Steber's actions did not constitute a search reflects more the fact that those actions did not, directly or indirectly, lead to anything of evidentiary value. Steber merely disconnected it from any networks to preserve evidence on the phone. *See Riley v. California*, 573 U.S. 373, 390-91 (2014) (discussing how mobile phones may need to be disconnected from networks to prevent them from being remotely erased). Or perhaps the government is arguing that it was not an *unlawful* search because it was a reasonable means to preserve evidence until investigators could obtain a warrant *See id.* at 391 (discussing *Illinois v. McArthur*, 531 U.S. 326 (2001)).

In any event, for the court's purposes Schroeder's motion fails because Steber's preliminary search of the phone (by unlocking it and putting it in airplane mode)

yielded no evidence. And even if Steber's actions could be characterized as a poisonous tree, it bore no fruit; there is simply nothing to suppress.

Alternatively, the court finds that Steber's actions were reasonable under the Fourth Amendment to preserve the contents of the phone pending a search warrant or consent to search it.

Steber testified that placing a seized phone in airplane mode is a "pretty standard law enforcement technique." (ECF No. 18 at 67.) This is hardly surprising given how easy it is to remotely delete the contents of a phone.

In 2014, the Supreme Court noted that it had been presented with "only a couple of anecdotal examples of remote wiping triggered by an arrest." *Riley*, 573 U.S. at 389. Today, however, it is common knowledge that the ability for a user to remotely delete all the contents of his phone is built into the phone and accessible for Apple users through iCloud or Google's Find Hub for Android users. Even when investigators have isolated the primary user of a cell phone, and thus can be confident that he will not be able to remotely delete the contents of the phone, the contents of the phone remain vulnerable because anyone with access to the user's iCloud or Google account could delete the phone's contents. There are also more sophisticated means by which a phone may be configured to essentially self-destruct automatically if it, for example, enters or leaves certain geographic areas. *See Riley*, 573 U.S. at 389.

The inherent vulnerability of the data on a cell phone created an exigent need to protect it until Steber could obtain a search warrant or consent to search the phone. The use of a Faraday bag—an alternative path to the same end but without the

Fourth Amendment implications—may seem like a more appropriate option. *See Riley*, 573 U.S. at 390-91. But the Fourth Amendment does not require law enforcement officers to pursue the best option; they must only avoid unreasonable options. *Plakas v. Drinski*, 19 F.3d 1143, 1149 (7th Cir. 1994) ("The Fourth Amendment does not require officers to use the least intrusive or even less intrusive alternatives in ordering search and seizure cases. The only test is whether what the police officers actually did was reasonable.").

Applying the framework set forth in *Illinois v. McArthur*, 531 U.S. 326, 331-32, it was reasonable for Steber to unlock the phone and place it in airplane mode. Steber's intrusion was narrow and brief. *Cf. id.* at 332-33. Although a cell phone may contain a vast amount of highly personal information, *Riley*, 573 U.S. at 395, an investigator is unlikely to come across anything private when putting a phone in airplane mode. At that point, Steber had probable cause to believe that Schroeder's phone contained evidence of a crime. He also had a legitimate concern that, absent prompt action, the data could be destroyed given the ease of remote wiping modern smartphones. *Cf. McArthur*, 531 U.S. at 331-32. Although Steber's precaution was based on standard practice rather than an individualized suspicion that Shroeder himself would delete the data, the intrusion was minimal and far less significant than the temporary restriction on access to a home upheld in *McArthur*. In light of the modest intrusion and the inherent risk of rapid, remote evidence destruction, Steber's actions were reasonable under the Fourth Amendment.

Therefore, the court will deny Schroeder's motion to suppress the contents of his cell phone.

## 5. Conclusion

A reasonable person in Schroeder's position would not believe he was under arrest when he participated in a brief, largely non-confrontational 30-minute interview in a conference room at his workplace. The discussion concerned serious allegations, but the demeanor of Steber and Brooks remained measured. Notably, Schroeder was informed that it was yet undetermined if he would be going to jail. Under these circumstances, Steber was not required to provide Schroeder with his *Miranda* warnings before interrogating him at the school.

When Steber unlocked Schroeder's phone and placed it in airplane mode, it did not lead to anything of evidentiary value that would be subject to suppression. And in any event Steber's actions were reasonable in light of the inherent risk that evidence on Schroeder's cell phone may be destroyed. Accordingly,

**IT IS THEREFORE ORDERED** that Schroeder's motion to suppress (ECF No. 11) is **denied**.

Dated at Green Bay, Wisconsin this 11th day of December, 2025.

s/ Byron B. Conway  
BYRON B. CONWAY  
U.S. District Judge